## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                   No. CR 12-1909 JB

AARON ROMERO,

       Defendant.

### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant Aaron Romero's Appeal of Detention Order Pending Trial, filed Sept. 18, 2012 (Doc. 65)("Detention Appeal"). The Court held a hearing on October 18, 2012. The primary issue is whether the Court should vacate the Honorable Lorenzo F. Garcia's, United States Magistrate Judge's Detention Order Pending Trial, filed Aug. 10, 2012 (Doc. 34), and release Defendant Aaron Romero pretrial on conditions. For reasons stated on the record at the hearing, the Court orders A. Romero released pretrial, to La Posada Halfway House, in Albuquerque, New Mexico, on specified conditions. The Court finds that the United States of America has not shown, by a preponderance of the evidence, that A. Romero is a flight risk. On the other hand, the United States has presented evidence that A. Romero is a danger to the community, but the Court does not believe that the United States has shown A. Romero's danger by clear-and-convincing evidence. The Court believes that conditions may be fashioned to A. Romero's release which will alleviate the concern that he poses a danger to the community -- first by releasing A. Romero to the custody of La Posada Halfway House, where he is on lock-down status, <u>i.e.</u>, he is not to leave, save to attend drug counseling and treatment, and he is to submit to Global Positioning System ("GPS") location monitoring.

## FACTUAL BACKGROUND

A. Romero was arrested as part of an undercover investigation into drug trafficking in Las Vegas, New Mexico. A. Romero is a life-long resident of Las Vegas, and there is no evidence that he travels outside of the community, much less that he travels outside of New Mexico. While A. Romero's past arrests and convictions evince some violence towards family members, he was not indicted on violent crime charges in this case, and he does not have a history of acting violently towards the community, other than family members. A. Romero has been indicted in this case for his alleged participation in the trafficking of cocaine and heroin, an indictment that falls within the rebuttable presumption that he should be detained under 18 U.S.C. § 3142(e).

### 1.    A. Romero's Background and Criminal History.

A. Romero is thirty-six years old and has resided in Las Vegas, New Mexico all of his life. See Pretrial Services Report at 1, dated Aug. 8, 2012. A. Romero has strong family ties and asserts that he has a supportive family. See Defendant Aaron Romero's Motion for Reconsideration of Detention Order ¶ 4, at 1, filed Sept. 12, 2012 (Doc. 47)("Reconsideration Motion"). A. Romero was residing in Las Vegas at the time of his arrest. See Pretrial Services Report at 1-2. Although A. Romero reported that he has resided only at the address he provided to Pretrial Services -- 512 9th Street, Apartment B, Las Vegas, 87701 -- A. Romero's father reported that A. Romero has resided only at that address for the past four or five years. See id. at 1-2. A. Romero does not have a United States Passport and has never traveled outside of the United States. See id. at 1-2.

A. Romero has never been married, but he was, some time ago, in an eight-year relationship with Magdalena Archuleta, and the two have two children together, aged nineteen and sixteen. See id. at 1-2. A. Romero's daughter recently moved to Albuquerque, and his son lives in Las Vegas with A. Romero's mother. See id. at 2. A. Romero's two brothers, as well as his parents, reside in

Las Vegas.  See Pretrial Services Report at 1.  A. Romero has two sisters, both of whom reside in Texas -- one in Austin and one in Houston.  See id. at 1.  A. Romero is in daily contact with his father, Albert Romero, but, as of August, 2012, had not been in contact with his mother and brothers for over four months.  A. Romero is not in contact with his sisters.  See id. at 1.  Over the past year, A. Romero became the caregiver for his father.  See Detention Appeal ¶ 5, at 2.

A. Romero was employed at Michael's Precision Automotive from July, 2012, and worked at this father's business, Quality Motors, for the past eighteen years.  See Pretrial Services Report at 2.  A. Romero reported that he, with his two brothers, are part owners of his father's business.  See id. at 2.  Albert Romero reported that A. Romero has not worked for him for the past three or four years, and, before that, has only worked for him sporadically, for a length of time which Albert Romero cannot recall.  See id. at 2.  Albert Romero told Pretrial Services that A. Romero was unreliable and unaccountable when he worked for his father.  See id. at 2.  Albert Romero informed Pretrial Services that he does not have any partners in his business, and that A. Romero is not a part-owner of Quality Motors.  See id. at 2.

A. Romero has eight previous arrests on his record.  A. Romero was first arrested at the age of eighteen, in Las Vegas.  A. Romero was arrested and charged for: (i) driving under the influence of alcohol/drugs; (ii) speeding; (iii) driving with a suspended or revoked license; (iv) possessing an open container of an alcoholic beverage; and (v) improper display of his license plates.  A. Romero pled guilty to all counts and was sentenced a fine of $215.00, plus court costs.  See Pretrial Services Report at 5.  At the age of twenty-one, A. Romero was arrested in Las Vegas for driving under the influence of alcohol or drugs, and speeding.  A. Romero pled guilty to driving under the influence of alcohol or drugs, and the speeding charge was dismissed.  A. Romero was sentenced to fines and fees on October 9, 1997.  On December 12, 2000, an Order to Show Cause was held for A.

Romero's Failure to Comply with his previous sentence.  Bench warrants were issued as to A. Romero on June 25, 2001, and on July, 16, 2001.  Pretrial Services reports that all obligations were met in this matter on September 6, 2001.  See id. at 5.

On October 4, 1999, A. Romero was arrested, at the age of twenty-three, for driving under the influence of alcohol or drugs, careless driving, and lack of evidence of financial responsibility as the owner of a vehicle.  A. Romero pled guilty to driving under the influence of alcohol or drugs, and the other charges were dismissed.  A. Romero was sentenced to fines and fees on April 4, 2000. On March 7, 2001, an Order to Show Cause was issued as to A. Romero for failure to pay his outstanding balance of his fees.  On June 25, 2001, a bench warrant was issued as to A. Romero. On July 11, 2001, A. Romero was sentenced to community service in lieu of fines, but A. Romero was still ordered to pay the court costs.  On January 29, 2002, an Order to Show Cause was again issued to A. Romero for failure to pay the outstanding balance for his court costs.  Pretrial Services reports that, on May 16, 2002, Pretrial Services reports that A. Romero's obligations were met in this matter.  See id. at 6.

A. Romero was arrested at the age of thirty, in 2007, in Las Vegas, on charges of: (i) false imprisonment; (ii) battery against a household member; and (iii) criminal damage to property less than $1,000.00.  These charges were dismissed on May 1, 2007.  See id. at 6.  A. Romero was arrested at the age of thirty-two, in Las Vegas, for allegedly driving with a suspended or revoked license, and for failing to display his registration plate.  Pretrial Services reported that the disposition of this arrest is unknown.  See id. at 6.  A. Romero was arrested on May 5, 2010, at the age of thirty-four, in Las Vegas, for misdemeanor Contempt of Court.  Pretrial Services reports that the disposition of this arrest is also unknown.  See Pretrial Services Report at 6.

A. Romero was arrested in Las Vegas  twice at the age of thirty-five.  On November 14,

2011, A. Romero was arrested for driving with a suspended or revoked license.  A. Romero pled guilty to this charge on January 10, 2012, and was sentenced to fines, fees, and a period of probation, on March 7, 2012.  See id. at 7.  A. Romero was arrested on January 23, 2012, for misdemeanor domestic violence.  A. Romero pled guilty/no contest to the charge and was sentenced to a period of probation on April 24, 2012.  A motion to revoke his probation was filed May 11, 2012.  Pretrial Services reports that this case is active, and A. Romero's probation revocation is still pending.  See id. at 7.

A. Romero reported no history of substance abuse or substance abuse treatment.  See id. at 3.  Albert Romero reported that A. Romero has used marijuana and cocaine, although his father could not report how often or to what extent.  See id. at 3.  Albert Romero also reported that A. Romero drinks "way too much" alcohol.  Pretrial Services Report at 3.

2.    **Nature and Circumstances of Alleged Criminal Activity.**

A. Romero is charged in eight counts of a fourteen-count Indictment, filed Aug. 7, 2012 (Doc. 2), along with four other co-Defendants -- Paul Ulibarri, George Barela, Ruby Aragon, and Gilbert Aragon.  See Indictment at 1-5.  A. Romero's charges are related to his alleged distribution of cocaine and heroin within 1,000 feet of the New Mexico Highlands University, a public university.  See Indictment at 1-5.

The United States alleges that A. Romero "repeatedly sold cocaine base, and heroin on at least one occasion, within 1,000 feet of New Mexico Highland University.  [A. Romero] sold cocaine base and heroin to an informant working in an undercover capacity for the [Drug Enforcement Administration]."  United States' Response to Defendant's Appeal of Detention Order ¶ 12, at 4, filed Sept. 19, 2012 (Doc. 66)("Appeal Response").  A. Romero also purchased cocaine directly from the United States' confidential informant.  See Transcript of Hearing (taken Oct. 18,

2012) Tr. at 19:6-9 (Hurtado)("Tr.").[1] The United States describes the Las Vegas drug trafficking community as "tight knit," and used undercover agents and confidential informants to obtain the evidence against A. Romero and his co-Defendants over the course of a month-long investigation. Tr. at 18:21-19:3 (Hurtado). The United States characterizes A. Romero's role in the alleged drug transactions as that of a "broker," because he served as a middle-man between a drug supplier and another purchaser, who in this case was a confidential informant. Tr. at 19:16-21 (Hurtado). A. Romero asserts that he was not a "broker," because he was engaged in drug transactions to feed his own cocaine addiction, evidenced by his receipt of cocaine in lieu of money for his services. Tr. at 29:3-9 (Garcia). The United States estimates that sixty-three grams of crack cocaine and forty-three grams of heroin are attributable to A. Romero from the drug transactions in the undercover investigation. See Tr. at 20:12-18 (Hurtado). The United States attributes the entirety of the drugs in the investigation to A. Romero, because the United States describes the crimes as a "conspiracy," although A. Romero is not indicted on conspiracy charges. Tr. at 21:17-21 (Hurtado). See Indictment at 1-5.

A. Romero asserts that he was addicted to cocaine at the time of the alleged drug transactions, and he would receive cocaine from a United States informant, as a "finder's fee," in exchange for arranging drug transactions. Defendant Aaron Romero's Reply in Support of his Appeal of Detention Order Pending Trial at 3, filed Sept. 21, 2012 (Doc. 68)("Romero Reply"). A. Romero asserts that he was "getting clean" in the period between the alleged transactions in the Indictment, which took place in November, 2011, and his arrest in 2012. Tr. at 26:8-11 (Garcia).

---

[1]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

**PROCEDURAL BACKGROUND**

A Grand Jury indicted A. Romero, Ulibarri, Barela, R. Aragon, and G. Aragon on August 7, 2012, for a number of violations pertaining to drug trafficking.  A. Romero was indicted for: (i) distributing a controlled substance containing a detectable amount of cocaine base within 1,000 feet of the New Mexico Highlands University, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 21 U.S.C. § 860(a); (ii) distributing a controlled substance containing a detectable amount of heroin, within 1,000 feet of the New Mexico Highlands University, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 21 U.S.C. § 860(a); and (iii) opening, leasing, renting, using, and maintaining a residential premises for the purpose of distributing and using controlled substances containing a cocaine base and heroin, in violation of 21 U.S.C. § 856(a)(1).  See Indictment at 1-5.  The Drug Enforcement Administration ("DEA") arrested A. Romero on August 8, 2012.  See Appeal Response ¶ 2, at 1.

Pretrial Services originally recommended that A. Romero be detained pending trial, stating that " there is no condition or combination of conditions that will reasonably assure the appearance of the defendant as required and the safety of the community."  Pretrial Services Report at 4. Pretrial Services lists the following factors indicating A. Romero's risk of non-appearance: (i) contradictory information provided by the defendant and his father, the verifying source; (ii) A. Romero's pending petition to revoke probation; (iii) A. Romero's use of other names and identifiers;[2] (iv) A. Romero's possible substance abuse issues; (v) A. Romero's previous poor performance under community supervision, and non-compliance with court orders, notably the

---

[2]Pretrial Services lists Romero's use of other "names and identifiers" as a factor indicating the risk that A. Romero might not appear, but Pretrial Services does not explain or list any other names or identifiers that A. Romero has used.  Pretrial Services Report at 3.  See Pretrial Services Report at 1-7.

contempt of court charges in his criminal history.  See Pretrial Services Report at 3.  Pretrial Services listed the following factors as suggesting A. Romero's danger to the community: (i) the nature of the alleged offense; (ii) his arrest and conviction history; (iii) A. Romero's history of domestic violence and abuse; (iii) A. Romero's possible substance abuse issues; and (iv) A. Romero's pending petition to revoke probation.  See Pretrial Services Report at 3.

A. Romero appeared, with his co-Defendants, at an arraignment and detention hearing before Judge Garcia on August 10, 2012.  See Transcript of Hearing (taken Aug. 10, 2012)("Aug. 10 Tr.").  At the hearing, A. Romero pled not guilty to the Indictment.  See Aug. 10 Tr. at 8:20-22 (Gleria).  A. Romero objected to Pretrial Services' recommendation that he be detained pending trial and requested Judge Garcia to release him to the La Posada Halfway House.  See Aug. 10 Tr. at 10:16-19 (Court, Gleria).  A. Romero stated that he has a "limited criminal history involving . . . four misdemeanors," some of which dated back to the 1990s.  Aug. 10 Tr. at 10:20-23 (Gleria).  A. Romero contended that there is no history of his noncompliance with appearance in court, pointing to his previous bench warrants having been resolved.  See Aug. 10 Tr. at 10:24-11:2 (Gleria).  A. Romero asserted that he has been meeting with his probation officer and that he is not a flight risk.  See Aug. 10 Tr. at 11:3-6 (Gleria).

Judge Garcia noted that A. Romero being on probation is a factor to consider under 18 U.S.C. § 3141(G).  See Aug. 10 Tr. at 11:10-12 (Court).  Judge Garcia noted, as well, that "the time frame of the alleged offenses in this case overlaps the period of probation."  Aug. 10 Tr. at 11:12-13 (Court).  Judge Garcia also noted A. Romero's criminal history and previous failures to appear, and found that A. Romero had failed to overcome the presumption of detention.  See Aug. 10 Tr. at 11:13-16 (Court).  Judge Garcia, accordingly, ordered that A. Romero would remain in custody.  See Aug. 10 Tr. at 11:16 (Court).  Judge Garcia states, in his order detaining A. Romero pending trial,

that "[t]here is a serious risk that the defendant will not appear . . . [and] that the defendant will endanger the safety of another person or the community."  Detention Order Pending Trial at 2. Judge Garcia also stated that his reasons for ordering A. Romero's detention were that he found "by clear and convincing evidence . . . that the defendant was on supervision at the time of the offense, the presumption has not been overcome and at this time there are not terms or conditions for release."  Detention Order Pending Trial at 2.

On September 12, 2012, A. Romero requested that Judge Garcia reconsider whether to detain A. Romero pending trial.  See Reconsideration Motion at 1.  A. Romero contended that he has a "limited criminal history," and that there is "no evidence he is a danger to the community or a risk of flight."  Reconsideration Motion ¶ 3, at 1.  A. Romero asserted that he is able to overcome the presumption that he should be detained pretrial.  See Reconsideration Motion ¶ 5, at 1.  A. Romero contended that pretrial detention should be used only when "it is clearly necessary." Reconsideration Motion ¶ 6, at 2 (citing United States v. Holloway, 781 F.2d 124, 125-26 (8th Cir. 1986)).  A. Romero asserted that "any doubts regarding release should be resolved in the defendant's favor."  Reconsideration Motion ¶ 7, at 2 (citing United States v. Townsend, 897 F.2d 989, 994 (9th Cir. 1990)).  A. Romero contended that he is presumptively innocent and, as such, "has a great liberty interest in avoiding pretrial detention."  Reconsideration Motion ¶ 8, at 3.  A. Romero contended that the Court "must dispose of every alternative before ordering pretrial incarceration under the Bail reform [sic] Act."  Reconsideration Motion ¶ 8, at 3 (citing United States v. Fernandez-Alfonso, 818 F.2d 477, 478 (9th Cir. 1987)).

A. Romero argued that his strong family ties and lack of criminal history "militate in favor of release to the La Pasada Half-way [sic] House."  Reconsideration Motion ¶ 9, at 3.  A. Romero "acknowledges he is charged with serious offenses, [but] he submits that he has presented sufficient

evidence and demonstrated factors that support that he is neither a flight risk nor a danger to the community and thus should be released." Reconsideration Motion ¶ 9, at 3. A. Romero stated that United States Pre-Trial Services does not oppose his release to the halfway house, "on condition that he also be required to post $10,000.00 secured bond with 10% to the Court." Reconsideration Motion ¶ 10, at 3. In support of his Reconsideration Motion, A. Romero provided letters from his colleagues and his supervisor at Michael's Precision Automotive in Las Vegas. A. Romero's supervisor, Michael J. Romero, states that "Aaron worked for me for approximately 2 months and his attendance was great, never late and even worked late to finish and help some people get back on the road. . . . . He has proven to me that he is capable of being a functional part of society." Letter from Michael J. Romero to the Court, dated Aug. 31, 2012, filed Sept. 12, 2012 (Doc. 47-1 at 1). A. Romero's colleague, Matthew Cordova, states that "I observed [] Aaron was always to work on time and never missed a day of work. He is a good guy." Letter from Matthew Cordova to the Court, dated Aug. 31, 2012, filed Sept. 12, 2012 (Doc. 47-1 at 2). A. Romero's colleague Jessie Vigil states that A. Romero had "good job performance . . . was always on time in the morning and well presented . . . . He was very responsible while at work . . . . He showed signs that he was making a change in his life to better him self [sic]." Letter from Jessie Vigil to the Court, dated Aug. 31, 2012, filed Sept. 12, 2012 (Doc. 47-1 at 3). A. Romero's colleague Daniel Smith states that A. Romero "was a good employee who was early to work everyday and sometimes worked late in the afternoons. In my opinion he had a very good work ethic and was caring for people around him. Also I know he was trying very hard to better his life." Letter from Daniel Smith to the Court, dated Aug. 31, 2012, filed Sept. 12, 2012 (Doc. 47-1 at 4).

United States of America opposed A. Romero's Reconsideration Motion. See United States' Response in Opposition to Defendant's Motion for Reconsideration of Detention Order, filed Sept.

12, 2012 (Doc. 48)("Reconsideration Response").  The United States asserted that A. Romero "represents a risk of flight and a danger to the community simply based upon the charges alone," under 18 U.S.C. § 3142(e).  Reconsideration Response ¶ 3, at 1.  The United States stated that the rebuttable presumption of detention is present in this case, because A. Romero is charged with a crime for which "'a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act.'"   Reconsideration Response ¶ 4, at 1-2 (internal alterations omitted)(quoting 18 U.S.C. § 3142 (e)).  The United States contended that a detention hearing may be reopened only "'if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue'" whether the defendant may be released under conditions which will assure the defendant's appearance and the safety of the community.  Reconsideration Response ¶ 5, at 2 (quoting 18 U.S.C. § 3142(f)).  The United States contended that A. Romero's Reconsideration Motion put forth no new factual information which was unknown to A. Romero at the time he was ordered detained, and thus reopening his detention was not justified.  See Reconsideration Response ¶ 6, at 2.

The United States also asserted that, even if there were new evidence underlying A. Romero's Reconsideration Motion, the evidence would not overcome the "statutory presumption that he is both a flight risk and a danger to the community, especially when combined with the particular circumstances of this case."  Reconsideration Response ¶ 7, at 2.  The United States also stated that, if there were new evidence that "could have a material bearing on the propriety of detention," A. Romero should present that information to Judge Garcia.  Reconsideration Response ¶ 8, at 2-3.

A. Romero replied to the United States' Reconsideration Response on September 14, 2012. See Defendant Aaron Romero's Reply to Government's Response to Defendant's Motion to

Reconsider Detention Order, filed Sept. 14, 2012 (Doc. 52)("Reply to United States' Response"). A. Romero contended that Pretrial Services informed his counsel that the recommendation for A. Romero's detention was based, in part, on inconsistencies between information provided by A. Romero and information provided by his father.  See Defendant Aaron Romero's Amended Reply to Government's Response to Defendant's Motion to Reconsider Detention Order ¶ 3, at 1, filed Sept. 14, 2012 (Doc. 55)("Amended Reply to United States' Response").[3] A. Romero stated that since filing the Pretrial Services Report, Pretrial Services had interviewed A. Romero's mother, Cheryl Romero, and that C. Romero's information clarified some of the supposed inconsistencies between A. Romero's statements and those of Albert Romero.  See Reply to United States' Response ¶¶ 5-6, at 2.  A. Romero also stated that Albert Romero was "ill and under medical treatment" when he spoke with Pretrial Services, and thus "his information may not have been necessarily accurate." Amended Reply to United States Response ¶ 5, at 2.  A. Romero asserted that C. Romero's information was "new information which was not available on August 10, 2012," which served to verify A. Romero's employment, ties to Las Vegas, and ownership of assets, and clarified the supposed inconsistencies noted in the Pretrial Services Report.  Amended Reply to United States Response ¶ 6, at 2.  A. Romero also asserted that conditions could be fashioned which would "ensure that he is not a danger to the community and that he will appear in Court for all hearings."  Amended Reply to United States Response  ¶ 7, at 2.

On September 18, 2012, Judge Garcia denied A. Romero's Reconsideration Motion.  See Order Denying Motion for Reconsideration of Detention Order, filed Sept. 18, 2012 (Doc. 1)("Order").   Judge Garcia noted that A. Romero's charged offenses, of "distribution or

---

[3]The Amended Reply to United States Response was filed "to correct grammatical and stylistic errors."  Amended Reply to United States Response at 1 n.1.

manufacturing controlled substances in or near schools and colleges, and maintaining or using a place for the distribution and use of controlled substance," fall within the rebuttable presumption of detention under 18 U.S.C. § 3142.  Order at 1.  Judge Garcia also noted that Albert Romero was unwilling to serve as a third-party custodian or as a co-signer of A. Romero's proposed appearance bond.  See Order at 1.  Judge Garcia stated that A. Romero's assertion that Albert Romero was possibly "confused" or "not thinking clearly," when he denied the request to be a third-party custodian and co-signer, was "speculation."  Order at 1-2.  Judge Garcia noted that C. Romero requested that A. Romero be released so that he could continue his care-giver responsibilities, but, A. Romero requested the Court to release him to the halfway house, not to his parents who reside in Las Vegas.  See Order at 2.  Judge Garcia stated that "for all practical purposes a bond is meaningless and only serves to impose a hardship on Romero and/or his family, who would have to pay $1,000.00 to secure the bond."  Order at 2-3.  Judge Garcia noted that the bond may deter A. Romero from fleeing, but A. Romero is not a flight risk.  Rather, Judge Garcia stated, A. Romero's "history of substance abuse, violence, and the current charges relating to controlled substances compels the Court to find that he is a danger."  Order at 3.

Judge Garcia stated that he was sympathetic to the family's plight, as A. Romero was, at one time serving as a primary care custodian while his father was ill.  See Order at 3.  Judge Garcia noted that, because of A. Romero's criminal charges, he would no longer be able to serve as a caregiver to his family, which would cause his family to suffer pending the resolution of A. Romero's criminal charges.  Judge Garcia stated that "other innocent individuals are always adversely affected when a loved one is arrested on criminal charges."  Order at 3.  Because of the seriousness of A. Romero's criminal charges, combined with his "history of substance abuse, acts of violence and disregard of Court orders," Judge Garcia concluded that he was compelled to deny

A. Romero's request for release to La Posada Halfway House.  Order at 3.

On September 18, 2012, A. Romero appealed his detention pending trial to the Court.  See Detention Appeal at 1.  A. Romero contended that he is "neither a flight risk nor danger to the community," and asserted that he has "strong ties to his community and in recent months had established a solid work history."  Detention Appeal ¶ 3, at 1.  A. Romero requested that the Court release him to La Posada Halfway House.  See Detention Appeal ¶ 6, at 2.

A. Romero argues that "Congress imposed procedural safeguards designed to limit detention to only those instances when it is clearly necessary."  Detention Appeal ¶ 9, at 2 (citing United States v. Holloway, 781 F.2d at 125-26).  A. Romero argues that "any doubts regarding release should be resolved in the defendant's favor."  Detention Appeal ¶ 10, at 2 (citing United States v. Townsend, 897 F.2d at 994).  A. Romero asserts that the Court should review his detention pending trial de novo.  See Detention Appeal ¶¶ 11-12, at 3.  A. Romero argues that he has overcome the presumption in favor of detention.  See Detention Appeal ¶ 13, at 3.  A. Romero contends that, because he is presumed innocent, his liberty interest requires a district court to dispose of every alternative before ordering him detained, under the Bail Reform Act, pretrial. See Detention Appeal ¶ 15, at 4 (referring to 18 U.S.C. §§ 3141-3150).

A. Romero contends that there is no evidence indicating that he is a violent individual or that he travels outside of the Las Vegas area.  See Detention Appeal ¶ 14, at 4.  A. Romero asserts that he has strong ties to family and to the community, a strong work history, and a commitment to his family, and that these characteristics warrant in favor of his release to La Posada Halfway House. See Detention Appeal ¶ 16, at 4.  A. Romero attached the same letters from his colleagues to his Detention Appeal as he attached to his Reconsideration Motion.  See Letter from Michael J. Romero to the Court, dated Aug. 31, 2012, filed Sept. 12, 2012 (Doc. 65-1 at 1); Letter from Matthew

-14-

Cordova to the Court, dated Aug. 31, 2012, filed Sept. 12, 2012 (Doc. 65-1 at 2); Letter from Jessie Vigil to the Court, dated Aug. 31, 2012, filed Sept. 12, 2012 (Doc. 65-1 at 3); Letter from Daniel Smith to the Court, dated Aug. 31, 2012, filed Sept. 12, 2012 (Doc. 65-1 at 4).  A. Romero "acknowledges that he is charged with serious offenses, [but] he submits that he has presented sufficient evidence and demonstrated factors that support that he is neither a flight risk nor a danger to the community and thus should be released."  Detention Appeal ¶ 16, at 4.

The United States steadfastly asserts that A. Romero should be detained pretrial. See Appeal Response ¶ 7, at 2.  The United States argues that the nature and circumstances of A. Romero's offense warrant his detention pretrial, as A. Romero is charged with "many counts of distribution or manufacturing controlled substances in or near schools and colleges, and maintaining or using a place for the distribution and use of a controlled substance . . . [which] carry a maximum term of 40 years' imprisonment."  Appeal Response ¶ 11, at 3.  The United States argues, thus, that the rebuttable presumption in favor of detaining A. Romero is met in this case.  See Appeal Response ¶ 11, at 3.  The United States also argues that the weight of the evidence against A. Romero favors detaining him pretrial, as the Indictment establishes probable cause that A. Romero committed the alleged offenses.  See Appeal Response ¶ 12, at 4.  The United States also contends that A. Romero's history and characteristics favor his pretrial detention, because his "choice to engage in drug trafficking -- on more than one occasion," shows that A. Romero shirked his other responsibilities, making his family obligations, ties, and work ethic unremarkable.  Appeal Response ¶ 13, at 4.

The United States contends that A. Romero's assertion that there is no evidence that he is a flight risk or danger to the community ignores the "fact that the crimes with which defendant is charged fall within the rebuttable presumption of detention," pursuant to 18 U.S.C. § 3142(e).

Appeal Response ¶ 14, at 4.  The United States points to A. Romero being on probation with a revocation proceeding pending for his domestic violence charges, his criminal history involving substance abuse and violence, and the occurrences in which A. Romero has been held in contempt of court, as evidence that A. Romero's history and characteristics weigh in favor of his detention. See Appeal Response ¶ 11, at 4-5.

A. Romero replied to the United States' Appeal Response on September 21, 2012.  A. Romero contends that the "government has failed to meet its heavy burden of proving, by clear and convincing evidence, that Mr. Romero is a danger to the community."  Romero Reply at 1.  A. Romero contends that the only evidence that he should be detained is his charged offense, of which he is presumed innocent.  See Romero Reply at 1.  A. Romero also contends that the Court should find that he is not a flight risk, as Judge Garcia found that A. Romero was not a flight risk, and Pretrial Services does not oppose his release to La Posada Halfway House.  See Romero Reply at 1-2.  A. Romero also argues that he has rebutted the presumption that he is a danger to the community, by offering some credible evidence "contrary to the statutory presumption."  Romero Reply at 2 (citing United States v. Alatishe, 768 F. 2d 364, 371 (D.C. Cir. 1985)).  A. Romero contends that he has met his burden and shown that he will not be a danger to the community, by presenting letters demonstrating his community ties and employment history, and by his available employment upon release at Michael's Precision Automotive.  See Romero Reply at 2.

A. Romero also points to Pretrial Services' interview of C. Romero, and argues that, since Pretrial Services initial report, Pretrial Services has now determined that placing A. Romero in a halfway house is appropriate.  See Romero Reply at 2.  A. Romero contends that his "minimal" criminal history involves only a history of substance abuse, and not violence or use of weapons, making appropriate his release to La Posada with conditions requiring drug treatment and

counseling.  Romero Reply at 2-3.  A. Romero contends that his release under these conditions will alleviate his risk of dangerousness, and will allow him to work and continue to provide for his family.  See Romero Reply at 3.

A. Romero also contends that because he allegedly sold cocaine base and heroin to an undercover agent, while A. Romero was addicted to cocaine, A. Romero's level of dangerousness is lessened by the context of the alleged drug transactions.  See Romero Reply at 3.  A. Romero also asserts that a government informant was giving A. Romero crack cocaine as a "finder's fee" for arranging the drug transactions.  Romero Reply at 3.  A. Romero contends that the United States has failed to meets its burden of persuasion that he is a risk of flight and poses a danger to the community, notwithstanding the rebuttable presumption in favor of his detention.  See Romero Reply at 3.  A. Romero argues that conditions could be fashioned which would assure the safety of any other person and the community, such as "halfway house placement, urinary analysis, drug treatment, and any other conditions the Court imposes."  Romero Reply at 4.

On October 17, 2012, the United States Probation Office ("USPO"), provided a memorandum to the Court regarding A. Romero's Detention Appeal.  See Memorandum Re: Aaron Romero Appeal of Detention Hearing, from Samuel Romero, United States Probation Officer, dated Oct. 17, 2012 ("USPO Memo.").  The USPO informed the Court that A. Romero's counsel, Erlinda Johnson, requested that Pretrial Services contact A. Romero's mother, C. Romero,[4] regarding A. Romero and his relationship with his father.  See USPO Memo. at 1.  Pretrial Services interviewed C. Romero on September 10, 2012.  Pretrial Services reports that C. Romero informed them that

---

[4]The USPO Memo. spells A. Romero's mother's first name "Sheryl," USPO Memo. at 1, but A. Romero spelled his mother's name "Cheryl," Reply to United States' Response ¶ 5, at 2.  The Court uses the spelling which A. Romero used, as the Court assumes A. Romero is able to accurately provide the spelling of his mother's name.

Albert Romero "has been hospitalized for the past four months . . . [and] may have been under prescribed medications and not thinking clearly," when Pretrial Services interviewed him. USPO Memo. at 1. C. Romero reported that she believes her husband spoke out of anger against A. Romero and his legal issues when interviewed. C. Romero also informed Pretrial Services that A. Romero was his father's primary caregiver and provided services for him which have not been replaced since A. Romero's arrest. See USPO Memo. at 1. Based upon this information, and further review of A. Romero's case file, Pretrial Services does not oppose A. Romero's release. Pretrial Services requests that the Court order A. Romero's release on $10,000.00 secured bond, with ten-percent to the Court, and upon the following recommended conditions: (i) that Pretrial Services would supervise A. Romero; (ii) that A. Romero would maintain or actively seek employment; (iii) that A. Romero's travel be restricted to his county of residence, with direct travel to the State of New Mexico only for Court appearances, and that Pretrial Services would be authorized to expand his travel within the United States, only if necessary; (iv) that A. Romero refrain from any use or possession of a firearm, destructive device, or other dangerous weapon or ammunition; (v) that A. Romero refrain from any use of alcohol, and that he submit to alcohol testing or treatment at Pretrial Services' discretion; (vi) that A. Romero refrain from any use or possession of a narcotic drug and other controlled substances, as defined under 21 U.S.C. § 802, unless the substance is prescribed by a medical practitioner; (vii) that A. Romero reside at La Posada Halfway House, and follow all program requirements; (viii) that A. Romero undergo psychiatric treatment or counseling if his supervising officer deems it is necessary; (ix) that A. Romero submit to drug testing and treatment at Pretrial Services' discretion; and (x) that A. Romero resolve his pending probation revocation matter within thirty days. See USPO Memo. at 1-2.

The Court held a hearing on October 18, 2012. A. Romero began by highlighting some of

his characteristics.  See Tr. at 3:6-12 (Garcia).  A. Romero pointed out that his mother, C. Romero, and father, Albert Romero, were present for A. Romero's hearing that day.  See Tr. at 3:13-15 (Garcia).  A. Romero stated that he is a thirty-five year old[5] man with two children and a life-long resident of Las Vegas, and that he has worked for his father for several years, and supported his mother and father.  See Tr. at 3:20-23 (Garcia).  A. Romero stated that one of the grounds for detention were the statements which Albert Romero made regarding his son, but that Albert Romero was not in a correct state of mind, as he was hospitalized, when those statements were made.  See Tr. at 3:23-4:2 (Garcia); id. at 4:4-6 (Garcia).  The Court inquired what the exact statements were that Albert Romero made regarding his son, and A. Romero stated that Albert Romero had expressed anger regarding A. Romero's addiction to crack cocaine, and that Albert Romero was angry because he had thought that A. Romero had become clean and put his life back on track by working at Michael's Precision Automotive.  See Tr. at 4:7-17 (Court, Garcia).  A. Romero stated that his father was angry because he thought A. Romero had "slipped up again."  Tr. at 4:16-17 (Garcia).  A. Romero asserted that his father was "a little confused" when Pretrial Services interviewed him, as he later related that he did not remember many of the questions he had been asked.  Tr. at 4:20-23 (Garcia).   The Court inquired why A. Romero was working at Michael's Precision Automotive if he was a partial owner of his father's business, and A. Romero stated that he wanted to get a full-time job on his own so he could support his father, and that his father's business had slowed a bit because of his father's illness.  See Tr. at 12:12-19 (Court, Garcia).  A. Romero stated that some of his family members did not want A. Romero around the family shop,

---

[5]A. Romero's counsel stated, at the hearing, that he is thirty-five years old.  See Tr. at 3:20-21 (Garcia).  Pretrial Services reports that A. Romero is thirty-six years old and that his birthday is May 1, 1976.  See Pretrial Services Report at 1.

because of his addiction, which was another reason he wanted to work at Michael's Precision Automotive.  See Tr. at 12:21-13:2.

Regarding A. Romero's employment at Michael's Precision Automotive, the Court inquired whether A. Romero was aware that he was being investigated, and sought the job so that, if arrested, he could argue that he should be released because he was employed.  See Tr. at 5:16-21 (Court). A. Romero asserted that he did not seek the job to avoid pretrial detention and that he "has a strong work history of working []for his father's business."  Tr. at 5:24-25 (Garcia).  A. Romero asserted that he was "sick and tired of being sick and tired," and that he was sick of dealing with his addiction and wanted to get his life back on track.  Tr. at 6:2-4 (Garcia).  A. Romero stated that he was trying to start over, and that he was not aware of the investigation.  See Tr. at 6:5-9 (Garcia).

The Court inquired about A. Romero's work history with his family business, as Albert Romero qualified A. Romero's employment as sporadic and not lengthy.  See Tr. at 10:9-14 (Court). A. Romero stated that he worked for his father off-and-on, and that, because he suffered from a crack addiction throughout much of his life, he worked for his family when he was sober, but other siblings would fill-in and also work sporadically when A. Romero was not working.  See Tr. at 10:18-24 (Garcia).  A. Romero asserted that his father's statements regarding A. Romero's work being sporadic did not dispute the information which A. Romero provided, as many family members worked sporadically for the family business, including his mother, who has a small hair salon business in addition to working for Albert Romero.  See Tr. at 10:25-11:7 (Garcia).  A. Romero stated that he was unable to work for his father for a lengthy period of time, but that he has worked for his father sporadically over the last three or four years, contrary to Albert Romero's statements. See Tr. at 11:17-21 (Court, Garcia).  A. Romero also affirmed that he is a part-owner in his father's business, contrary to his father's statements.  See Tr. at 12:5-11 (Court, Garcia).

A. Romero stated that, before working at Michael's Precision Automotive, he had worked for his father, and also he had served as his father's caregiver from about April or May, 2012. See Tr. at 6:12-15 (Garcia); id. at 6:17-24 (Garcia, Defendant, Court).  A. Romero stated that he had been taking his father to Albuquerque for appointments, rehabilitation, and therapy treatments necessary to treat his father's severe diabetes. See Tr. at 6:25-7:4 (Garcia, Court). A. Romero stated that his father is confined to a wheelchair and has neuropathy[6] in his legs. See Tr. at 7:5-9 (Garcia, Defendant).  A. Romero stated that his work record confirmed the fact that he was clean and that his colleagues describe him as having a good work ethic. See Tr. at 7:17-20 (Garcia).  A. Romero asserted that all of these characteristics support A. Romero's release under 18 U.S.C. § 3142(g). See Tr. at 7:23-25 (Garcia).

The Court inquired about A. Romero's family, and A. Romero stated that his mother, C. Romero, brought A. Romero to Court that day, and that he has other siblings in Las Vegas. See Tr. at 8:3-13 (Court, Garcia).  A. Romero stated that Pretrial Services supports his release to La Posada Halfway House, but the Court noted that releasing him to La Posada would not address his caretaker responsibilities, and thus the justification for his release is not met by releasing him to La Posada. See Tr. at 8:15-24 (Garcia, Court).  A. Romero responded that, even if he is not released to be a caretaker, the other statutory factors still favor his release, because he is not a danger to the community, as the nature and circumstances of the offense do not involve any violence. See Tr. at 9:2-9 (Garcia).  A. Romero posited that he has a limited criminal history, all of which is attributed to substance abuse. See Tr. at 9:10-13 (Garcia).  The Court responded that Judge Garcia appeared

---

[6]Neuropathy is: "1. A classic term for any disorder affecting any segment of the nervous system.  2. In contemporary usage, a disease involving the cranial nerves or the peripheral or autonomic nervous system." Neuropathy, in Stedman's Medical Dictionary 1313 (28th ed. 2006).

to be very critical of A. Romero's criminal history, which displays substance abuse, violence, and pending charges.  See Tr. at 9:15-19 (Court).  A. Romero asserted that his current charges do not involve any violence, and that Judge Garcia was likely referring to his misdemeanor domestic violence charges from 2008.  See Tr. at 9:22-10:1 (Garcia).  A. Romero asserted that even his domestic violence charges did not involve any weapons or aggravated violence, and that he had received counseling for his domestic violence.  See Tr. at 10:4-6 (Garcia).

Regarding the nature and circumstances of the alleged federal offense with which he is charged, A. Romero stated that it was the United States' agents who were giving him crack cocaine as a finder's fee for arranging drug transactions.  See Tr. at 13:3-7 (Garcia).  A. Romero asserted that the contribution of the United States to A. Romero's alleged crimes alleviates any concern about A. Romero's dangerousness.  See Tr. at 13:8-11 (Garcia).  A. Romero also argued that his detention should be a last resort and that the Bail Reform Act does not modify the presumption of his innocence.  See Tr. at 13:11-14 (Garcia).

A. Romero asserted that he has family support, that he can get treatment while at La Posada, and that he can work to start improving himself.  See Tr. at 13:15-19 (Garcia).  A. Romero asserted that he is capable of functioning in society when he is not on crack cocaine, and that he is in need only of a support system.  See Tr. at 13:20-22 (Garcia).  A. Romero also asserted that he is not a flight risk, pointing to Judge Garcia having found that A. Romero is not a flight risk.  See Tr. at 13:23-14:4 (Garcia).  A. Romero stated that  he is a life-long resident of New Mexico, with partial ownership of property in the State, and that he has every intention of appearing and defending himself against his charges at every Court proceeding.  See Tr. at 14:7-12 (Garcia).

The Court inquired about A. Romero's history of complying with court orders, as his criminal history contains several bench warrants that were issued for his failure to comply and to

pay fines, and he is currently under supervision and has an active case with a probation revocation pending. See Tr. at 14:14-22 (Court). The Court stated that "[t]he impression I get is that he hasn't performed well on supervision on probation." Tr. at 14:23-24 (Court). A. Romero disagreed with the Court's impression, and asserted that his arrest warrants on misdemeanor offenses were issued "well over ten years ago" and that his criminal history is all attributed to substance abuse. Tr. at 14:25-15:6 (Garcia). Regarding A. Romero's pending probation revocation, A. Romero stated that he appeared in July, 2012, and that he has been reinstated on probation. See Tr. at 15:9-12 (Garcia). A. Romero stated that the probation revocation was an issue because he had not enrolled in some classes, and that he had difficulty enrolling in the classes because he was caring for his father at the time. See Tr. at 15:12-17 (Garcia). The Court inquired of the circumstances of A. Romero's contempt of court charge, and A. Romero's counsel stated that neither she, nor Pretrial Services, has any information on the charge. See Tr. at 15:18-24 (Court, Garcia).

Regarding the proposed conditions of A. Romero's release, the Court inquired of A. Romero what conditions "would realistically address the danger to the community," as Judge Garcia had found that a posting a bond would only deter A. Romero's flight, which Judge Garcia did not consider a risk. Tr. at 15:25-16:13 (Court). A. Romero stated that releasing him to La Posada, in combination with drug treatment and counseling, would address the concerns regarding his potential danger to the community. See Tr. at 16:14-20 (Garcia). A. Romero proposed that his travel could be restricted to New Mexico, that he could be prohibited from possessing firearms, and that he could have drug-testing to assure that he is staying clear from cocaine. See Tr. at 16:20-25 (Garcia). A. Romero also proposed that, if he were released, he could also continue working, which would motivate him to stay clean and further alleviate his risk of dangerousness. See Tr. at 17:5-8 (Garcia).

In closing, A. Romero asserted that he has rebutted the statutory presumption in favor of detention, by producing evidence from his colleagues and proposing conditions on his release.  See Tr. at 17:13-21 (Garcia).  A. Romero asserted that all that is required to rebut the presumption is credible evidence contrary to the presumption, and that he has met that burden.  See Tr. at 17:21-22 (Garcia).  A. Romero asserted that the United States has not proved that he is dangerous.  See Tr. at 17:25-18:2 (Garcia).

The Court inquired of the United States regarding the circumstances of A. Romero's alleged federal crime.  See Tr. at 18:12-14 (Court).  The United States stated that A. Romero is charged in a multi-count Indictment with violations of eight of the fourteen counts.  See Tr. at 18:15-17 (Hurtado).  The United States stated that A. Romero's primary violations include distribution or manufacturing of controlled substances in or near schools or colleges.  See Tr. at 18:17-20 (Hurtado).  The United States stated that A. Romero's Indictment was the result of a month-long investigation in the Las Vegas area, a tight-knit drug community, and that the DEA used undercover agents and confidential informants to obtain the evidence upon which the Indictment is based.  See Tr. at 18:21-19:3 (Hurtado).  The United States stated that A. Romero is charged with purchasing controlled substances through confidential informants whom the DEA employed.  See Tr. at 19:4-6 (Hurtado).  The United States characterized its evidence as strong, "given these direct hand to hand purchases using confidential informants."  Tr. at 19:6-9 (Hurtado).  The United States asserted that A. Romero is charged with "C level offenses" and that the United States believes A. Romero was a broker: "[H]e makes arrangements with a drug supplier, who then is able to provide drugs to Mr. Romero, Mr. Romero in turn sells those drugs from the drug supplier to a confidential informant."  Tr. at 19:14-21 (Hurtado).  The United States stated that A. Romero is "not a king pen by any means," but that he is charged with the most charges in the Indictment.  Tr. at 19:22-25 (Hurtado).

-24-

The United States estimated that approximately sixty-three grams of cocaine and forty-three grams of heroin are attributable to A. Romero.  See Tr. at 20:12-15 (Hurtado).  The United States asserted that these amounts are "substantial," even though not "a lot of weight," given the close-knit nature of the drug trafficking community in Las Vegas.  Tr. at 20:15-18 (Hurtado).  The United States asserted that the charges against A. Romero fall within the rebuttable presumption of detention under 18 U.S.C. § 3142.  See Tr. at 20:1-3 (Hurtado).  The United States stated that the alleged conspiracy in which A. Romero was involved included four other persons, the other named Defendants in this case.  See Tr. at 21:1-5 (Hurtado).  The United States stated that the drugs attributable to A. Romero encompassed the total amount of drugs involved in the conspiracy.  See Tr. at 21:6-10 (Court, Hurtado).  The United States stated that it agrees with Judge Garcia that the primary issue is not A. Romero's risk of flight, but his danger to the community.  See Tr. at 22:4-8 (Court, Hurtado).  The United States pointed to A. Romero's criminal history, and argued that it favors his detention, and not his release.  See Tr. at 22:21-23:1 (Hurtado).  The United States noted that Pretrial Services did not factor into its non-opposition to A. Romero's release the rebuttable presumption in favor of his detention.  See Tr. at 23:4-11 (Hurtado).

The Court stated that, if A. Romero were released to the halfway house in Albuquerque, "it would make it difficult for him to do much drug trafficking up in Las Vegas."  Tr. at 23:12-15 (Court).  The Court noted that his "violence seems directed toward members of his family, so he's going to be away from his family.  He doesn't seem to be a violent person to third parties."  Tr. at 23:15-18 (Court).  The Court inquired of the United States what its fear would be if A. Romero is released to La Posada.  See Tr. at 23:19-22 (Court).  The United States asserted that its fear arises from A. Romero's "difficulty complying with conditions of release in the past."  Tr. at 23:23-25 (Hurtado).  The United States asserted that "the defendant's father said it best . . . even the

defendant's own father was unwilling to assume the responsibilities for third party custody." Tr. at 24:3-7 (Hurtado). The United States stated that A. Romero is unreliable and unaccountable, as shown by his sporadic work history. See Tr. ta 24:9-11 (Hurtado). The United States stated that A. Romero's "history of violence, possible substance abuse issues and the pending petition to revoke his probation," evidences that A. Romero still represents a risk, even if he were away from the Las Vegas community. Tr. at 24:12-17 (Hurtado).

The Court inquired of the United States what conditions the United States would like to see if A. Romero were released, and the United States said it would like to see "zero tolerance." Tr. at 24:21-23 (Court, Hurtado). The United States requested that A. Romero's release be conditioned upon him not contacting his co-Defendants, using drugs, possessing firearms, or associating with any known, convicted felons. See Tr. at 25:1-4 (Hurtado).

The Court stated that it is still concerned with A. Romero's drug problem. See Tr. at 25:8-10 (Court). The Court stated that it is concerned because A. Romero has not done well with supervision, but noted that A. Romero is probably not a danger to anybody if he is placed in La Posada. See Tr. at 25:10-14 (Court). The Court suggested that A. Romero could be released to La Posada, and put on electronic monitoring and detained in-house. See Tr. at 25:15-21 (Court). The Court expressed that, were A. Romero placed at La Posada but also released to the community, the Court is concerned he would behave violently. See Tr. ta 25:22-25 (Court).

A. Romero stated that he would abide by any conditions the Court placed on his release, including the strict electronic monitoring at the halfway house. See Tr. at 26:4-8 (Garcia). A. Romero stated that it has been some time since he has used crack cocaine, and that he is willing and ready to get the treatment he needs. See Tr. at 26:11-15 (Garcia).

The Court inquired of the United States Probation Officer, how the Court could release A.

Romero to La Posada and confine him to the facility.  See Tr. at 26:25-27:4 (Court).  The Probation

Officer responded that A. Romero could either be released with zero tolerance, which would require

him to remain at the facility at all times, making GPS monitoring not necessary, or A. Romero could

be allowed to leave the facility, with GPS monitoring, to attend counseling.  Tr. at 27:10-20

(Probation Officer).  The Court asked the Probation Officer her thoughts on releasing A. Romero,

under "lock-down" conditions at the beginning, and then allowing him to participate in counseling

later.  Tr. at 27:23-28:2 (Court).  The Probation Officer stated that she prefers to allow defendants

to have access to counseling, so that they may be productive while at La Posada, because defendants

who are idle usually run into problems.  See Tr. at 28:3-14 (Probation Officer).

A. Romero stated that he believes he needs counseling and drug treatment immediately.  See

Tr. at 28:18-20 (Garcia).  A. Romero also responded to the United States' characterization of his role

in the alleged conspiracy, and A. Romero posited that he was participating to feed his habit.  See Tr.

at 29:1-6 (Garcia).  A. Romero contended that he was not a broker, in the traditional sense, because

he was paid in cocaine rather than in cash.  See Tr. at 29:6-9 (Garcia).  A. Romero also asserted that

the Indictment does not contain conspiracy charges, but rather only allegations of hand-to-hand

transactions, making the quantity of drugs attributable to A. Romero "significantly less" than the

United States had asserted.  Tr. at 29:15-20 (Garcia).  A. Romero's counsel provided the Court with

a print out from the New Mexico Courts, which indicates that A. Romero's probation was continued

and that his pending probation revocation was resolved on July 30, 2012.  See Tr. at 30:5-10

(Garcia)(referring to New Mexico Courts Case Look Up, Case No. M-48-VM-201200008 (Oct. 17,

2012), https://caselookup.nmcourts.gov/caselookup/app (noting that, as of July 30, 2012, A.

Romero's probation was ordered continued)).

The Court stated that it does not believe that the United States has shown, by a

preponderance of the evidence, that A. Romero is a flight risk, although the United States has presented some evidence to show that he is a danger to the community. See Tr. at 31:3-10 (Court). The Court stated that it is not sure that the evidence that A. Romero is a danger to the community is clear and convincing, such that his risk of danger could not be reduced to an acceptable level. See Tr. at 31:9-13 (Court). The Court granted A. Romero's request to be released on certain pretrial conditions. See Tr. at 31:14-15 (Court). Noting that A. Romero's criminal history contained substance abuse charges and domestic violence, the Court stated that as long as A. Romero is away from Las Vegas -- where his family is -- and does not have access to controlled substances, A. Romero's risk of harm to the community is likely diminished. See Tr. at 31:15-25 (Court).

The Court ordered A. Romero to be released to La Posada and required A. Romero to post a bond. See Tr. at 32:1-2 (Court). The Court allowed A. Romero to attend drug counseling, but required him to use the GPS monitor when attending. See Tr. at 32:5-7 (Court). The Court did not allow him to seek employment in the community. See Tr. at 32:7-8 (Court). Besides attending drug counseling, the Court ordered that A. Romero be kept on lock-down at La Posada. See Tr. at 32:9-11 (Court). The Court ordered the United States' requested conditions to be imposed as well. See Tr. at 32:12-13 (Court). A. Romero requested that he be able to leave the halfway house to attend educational opportunities, see Tr. at 33:10-13 (Garcia), but the Court denied his request and ordered that A. Romero may leave only for drug counseling at the time, see Tr. at 33:23-34:1 (Court). The Court also denied A. Romero's request to be able to leave to meet with his attorneys. See Tr. at 34:2-4 (Garcia); id. at 34:9-10 (Court).

The Court stated that any changes to the conditions of A. Romero's release would be made only by Court order, and a hearing could be held at the future, at which the United States could respond to any requested change to the conditions of A. Romero's release. See Tr. at 32:19-23

(Court).  The Court ordered A. Romero to post a bond of $10,000.00, ten-percent of which would be secured.  See Tr. at 32:25-33:2 (Court).

## LAW REGARDING PRETRIAL DETENTION

Pursuant to the Bail Reform Act of 1984, 18 U.S.C. §§ 3141 through 3150, a defendant may be detained pending trial only after a hearing, held pursuant to 18 U.S.C. § 3142(f), and upon a finding "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e). At such a hearing, the United States bears the burden of proving risk of flight by a preponderance of the evidence, and the burden of proving dangerousness by clear-and-convincing evidence.  See 18 U.S.C. § 3142(f); United States v. Cisneros, 328 F.3d 610, 616 (10th Cir. 2003).  "The rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing."  18 U.S.C. § 3142(f).  To determine whether pretrial detention is warranted, the judicial officer must consider the statutory factors set forth in 18 U.S.C. § 3142(g):

> (g)   **Factors to be considered.** -- The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning --
>
> (1)   the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2)   the weight of the evidence against the person;
>
> (3)   the history and characteristics of the person, including --
>
> > (A)   the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating

> > to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> > (B)   whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4)   the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

18 U.S.C. § 3142(g).

When a defendant is charged with certain crimes, however, a presumption arises that the defendant is a flight risk and a danger to the community. See 18 U.S.C. § 3142(e)(3); United States v. Villapudua-Quintero, 308 F. App'x 272, 273 (10th Cir. 2009)(unpublished)(per curiam)(recognizing that 18 U.S.C. § 3142(e) establishes a rebuttable presumption favoring detention in the case of, among other defendants, certain alleged drug offenders). 18 U.S.C. § 3142(e)(3)(A) provides that a presumption of detention arises when "there is probable cause to believe that the person committed" certain drug offenses, specifically "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act, the Controlled Substances Import and Export Act, or chapter 705 of title 46." 18 U.S.C. § 3142(e)(3)(A). The United States Court of Appeals for the Tenth Circuit has explained that "[t]he grand jury indictment is sufficient to establish the finding of probable cause that defendant committed a federal drug offense with a maximum prison term of ten years or more." United States

v. Silva, 7 F.3d 1046, 1046 (10th Cir. 1993).  Accord United States v. Holguin, 971 F. Supp. 2d 1082, 1088 (D.N.M. 2011)(Browning, J.).  "'Once the presumption is invoked, the burden of production shifts to the defendant.'"  United States v. Holguin, 791 F. Supp. 2d at 1087 (quoting United States v. Stricklin, 932 F.2d at 1354-55).

To determine whether the defendant has rebutted the presumption of detention, a court must consider: (i) the nature and  circumstances of the crime charged; (ii) the weight of the evidence against the defendant; (iii) the history and characteristics of the defendant, including family ties, employment, financial resources, community ties, drug or alcohol abuse history, and past conduct; and (iv) the nature and seriousness of the danger to the community or to an individual that would be posed by release.  See 18 U.S.C. § 3142(g).  "Should the defendant satisfy his or her burden of production, the United States must then show by a preponderance of the evidence that the defendant presents a risk of flight, or by clear-and-convincing evidence that the defendant presents a danger to the community."  United States v. Holguin, 791 F. Supp. 2d at 1087 (citing United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001); United States v. Stricklin, 932 F.2d 1353, 1354-55 (10th Cir. 1991)("[T]he burden of persuasion regarding risk-of-flight and danger to the community always remains with the government.")).  Notably, however, even if the defendant meets his or her burden of production, "the presumption remains a factor for consideration by the district court in determining whether to release or detain."  United States v. Stricklin, 932 F.2d at 1355.  Accord United States v. Mercedes, 254 F.3d at 436.

## THE DISTRICT COURT'S STANDARD OF REVIEW

Section 3145(a) of Title 18 provides that a "court having original jurisdiction over the offense" may review a magistrate judge's detention order or release order.  18 U.S.C. § 3145(a)-(b). "The standard of review for the district court's review of a magistrate judge's detention or release

order under § 3145(a) is de novo." United States v. Cisneros, 328 F.3d 610, 616 n.1 (10th Cir. 2003). "When the district court acts on a motion to revoke or amend a magistrate's pretrial detention order, the district court acts de novo and must make an independent determination of the proper pretrial detention or conditions for release." United States v. Rueben, 974 F.2d 580, 585-86 (5th Cir. 1992). See United States v. Maull, 773 F.2d 1479, 1481 (8th Cir.1985)(stating that a district court's review of magistrate judge's order setting bond was de novo).

## ANALYSIS

Given his strong ties to Las Vegas and to New Mexico, and his lack of history of traveling outside the immediate area, there does not appear to be a significant risk that A. Romero will flee. Judge Garcia did not think that there was much of a risk of flight, and the United States does not advance an argument otherwise forcefully. Accordingly, the United States has not shown, by a preponderance of the evidence, that A. Romero is a risk of flight. The Court can impose some condition or a combination of conditions that will reduce his flight risk to acceptable levels.

As to his danger to the community or to individuals, the Court concludes that, if the Court gets him out of the tight-knit drug community of Las Vegas, and puts him in a halfway house in Albuquerque, it will reduce his danger to the community significantly and, most importantly, to acceptable levels. It will be difficult for him to drug traffic in Las Vegas if he is at a halfway house in Albuquerque, and the Court can protect the Albuquerque community by severely restricting his activities and movement.

As to his danger to any specific individuals, it appears he is only a danger to family members. He does not appear to be a violent person toward non-family members. If he is in an Albuquerque halfway house, he will be away from family or will be meeting with them in the structured, safe environment of a halfway house in Albuquerque.

While A. Romero does not have the best history of complying with conditions of supervised release, he also does not have the worst the Court has seen. In perspective, his failures appear manageable and are largely drug-related inattentiveness and unreliability. The Court believes it can assure his accountability by putting him in the supervision of a drug-free environment of a halfway house in Albuquerque. He will be on a zero tolerance condition; he cannot contact co-Defendants, use drugs, possess firearms, or associate with known felons except those at the halfway house, who are presumably trying to behave as well before their trial and do not want to be detained. The Court can release him from the halfway house to go to drug treatment, which should help him with his drug problem. When he leaves, he will be on GPS monitoring,[7] helping to reduce the flight risk when he leaves the facility and might be tempted to do something nefarious. The Court will also reduce his chances for flight or drug activity by not allowing him to work or go to school at the present time, so he will be on lock-down at the halfway house except for the limited time that he goes for drug treatment. If the Court can reduce his need for drugs, his chances of drug trafficking decrease, because he appears to have largely been selling drugs to feed his habit.

In sum, the United States has not shown by a preponderance of the evidence that A. Romero is a flight risk, and additionally the United States has not shown by clear-and-convincing evidence that he is a danger to the community, and the Court can reduce that risk to acceptable levels by conditions or a combination of conditions. Accordingly, the Court will release him pretrial on conditions. The Court will require A. Romero to post a bond to minimize the risk of flight. He can

---

[7]"GPS" is an acronym for "global positioning system." GPS, The Free Dictionary, http://www.thefreedictionary.com/GPS (last visited Dec. 4, 2012). "Global Positioning System" refers to a "system of satellites, computers, and receivers that is able to determine that latitude and longitude of a receiver on Earth by calculating the time difference for signals from different satellites to reach the receiver." Global Positioning System, The Free Dictionary, http://www.thefreedictionary.com/global+positioning+system (last visited Dec. 4, 2012).

attend drug counseling, but must wear GPS monitoring when attending; the Court will not allow him to seek employment or go to school at this time.  Thus, other than for drug treatment, he will be on lock-down at La Posada Halfway House in Albuquerque.

        **IT IS ORDERED** that the Defendant Aaron Romero's Appeal of Detention Order Pending Trial, filed Sept. 18, 2012 (Doc. 65), is granted in part.  Defendant Aaron Romero is ordered released pretrial to La Posada Halfway House in Albuquerque, New Mexico.

                                        _____
                                        UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
  United States Attorney
Samuel A. Hurtado
  Assistant United States Attorney
Albuquerque, New Mexico

        *Attorneys for the Plaintiff*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

-- and --

Monnica L. Garcia
Law Office of Monnica L. Garcia, LLC
Albuquerque, New Mexico

        *Attorneys for the Defendant*